Filed 10/17/14  In re I.F. CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re I.F., a Person Coming Under the Juvenile Court Law. | |
| SONOMA COUNTY HUMAN SERVICES DEPARTMENT,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>EDUARDO L.,<br><br>　　　　Defendant and Appellant. | A140448<br><br>(Sonoma County<br>Super. Ct. No. 4127-DEP) |

Eduardo L. (Father) appeals from an order terminating his parental rights pursuant to Welfare and Institutions Code section 366.26.[1]  He asserts the dependency court abused its discretion in denying his request at the permanency planning hearing that minor, I.F., his biological daughter, be removed from her "fost-adopt" home and placed in a guardianship with her maternal grandmother (Grandmother).  We affirm the order.  Father lacks legal standing to challenge the denial of a change in placement, and in any event, the trial court reasonably denied the placement request.

---

[1] All further statutory references are to the Welfare and Institutions Code.

# I. BACKGROUND

## A. *Events Preceding Father's Section 366.26 Writ Petition*[2]

On February 11, 2013, when minor was approximately six weeks old, the Sonoma County Human Services Department (Department) filed a section 300 petition following her mother's (Mother) arrest for violating parole and felony possession of methamphetamines. The petition alleged Mother had a substance abuse problem and Father (whose paternity had not yet been established) had a substance abuse problem and a history of domestic violence.

Mother and Father were both incarcerated at the time the petition was filed. The petition alleged that Mother was arrested on or about February 7, 2013, and had used methamphetamines while pregnant with minor. It further alleged Father was arrested for violation of parole and possession of a controlled substance on February 7, 2013, for possession of marijuana on November 16, 2004, and for transportation, distribution and importation of marijuana on May 20, 2011. A separate count alleged Father had a history of domestic violence, including two arrests in 2004, which placed minor at substantial risk of harm in his care.

In an in-custody interview, Mother stated she moved to Santa Rosa with Father because she was homeless and living in shelters in Alameda County and Father had picked her up two weeks earlier and offered her his home. The social worker also interviewed Father. He stated he was not sure if he was minor's father and wanted a DNA test. He stated he had taken Mother to live with him over a month earlier because he did not want minor to live in a homeless shelter. He said he was hardly home but made sure Mother had food to eat and a roof over her head.

The dependency court ordered minor detained, and set the matter for a jurisdiction hearing. The Department's jurisdiction report detailed Father's lengthy criminal history, which included convictions for child cruelty involving possible injury or death, battery,

---

[2] The background facts in this section are summarized from our nonpublished opinion in an earlier, related proceeding. (*Eduardo L. v. Superior Court* (Sept. 30, 2013, A139225) (*Eduardo L. I*).)

battery against a police officer, battery against a custodial officer, evading a police officer, and stalking. Father's criminal history also included two arrests in 2004 for domestic violence, as well as arrests for willful cruelty to a child, assault with a deadly weapon (two arrests), threatening crime with intent to terrorize, possession of a controlled substance, and transportation and importation of marijuana.

Father was on parole at the time with a discharge date of July 10, 2013. In March 2013, Father was released to United States Immigration and Customs Enforcement (ICE) and was awaiting deportation in a holding facility.

After the jurisdiction hearing was continued, the Department filed its disposition report recommending family reunification services not be provided to Father and that Mother be bypassed for reunification services pursuant to section 361.5, subdivision (b)(13) and a hearing set pursuant to section 366.26.

The disposition report contained the following information from Father: He was involved with Mother for a short time. He was aware she was pregnant and intended to be involved in his child's life. Father had no contact with Mother during her pregnancy. He stated he expected Mother would be in touch with him, but she did not contact him until a few weeks after the baby was born. At that time, Mother informed him she and minor were homeless and had nowhere to go. Father made arrangements for Mother and minor to come live with him at his mother's home.

On February 21, 2013, Father informed the social worker he wanted to take care of his child and was fit for this task. The Department had provided weekly supervised visitation for Father but, after careful evaluation, did not feel it was in the best interest of minor to continue visitation until paternity was established.

After genetic testing confirmed Father as minor's father, the Department filed an addendum report requesting Father be found a mere biological father not eligible for reunification services. At the contested disposition hearing on June 24, 2013, Mother submitted on the disposition report and recommendation. Father, in custody in Alameda County, requested presumed father status through counsel.

The dependency court ruled Father did not rise to the level of presumed father and found him a mere biological father based upon the evidence that his actions were "insufficient, inadequate as a matter of law to elevate his status." The court sustained the allegations of the section 300 petition, found by clear and convincing evidence minor would be at substantial risk of danger if she were returned to her parents' custody, ordered that no reunification services be provided to Mother or Father, and continued the matter for a permanency planning hearing pursuant to section 366.26. Father timely petitioned for an extraordinary writ which this court denied in *Eduardo L. I, supra*, A139225.

## B. *Permanency Planning Proceedings*

The Department's section 366.26 assessment report filed September 30, 2013, recommended the court terminate parental rights and order adoption as minor's permanent plan. Minor had been placed in a fost-adopt home since July 22, 2013. The foster parents had an approved adoption home study and had a toddler son whom they had adopted. The foster parents were "very committed to [minor] and express a desire to adopt her." The report found the foster parents had the capacity to meet minor's needs, provided her a safe, secure environment and a predictable routine, nurtured her growth and development by ensuring her medical needs were met, and provided her with physical and emotional comfort and affection. The social worker concluded removal from the potential adoptive parents would be seriously detrimental to minor's well-being.

The report noted minor was healthy, showed steady improvement in her development, and was progressing well. The report found: "[Minor] is currently described as a generally happy and content baby. . . . She appears to feel secure in her new home and is not exhibiting any emotional, behavioral, or mental health issues at this time." At the time the report was prepared, Mother was homeless and her exact whereabouts were unknown. Father was incarcerated in an ICE facility in San Diego, pending deportation.

The assessment report also noted the following: "On August 30, 2013, [Grandmother] submitted a written request to this worker to adopt [minor].

4

[Grandmother] was in contact with the placement specialist throughout the seven months [minor] was in emergency foster care, and during that time [Grandmother] expressed she was not able to be a placement option for [minor]. [Grandmother] was aware that [minor] was being matched with a non-related fost-adopt family and would be transitioning to that home in July 2013. As services have been bypassed for the parents and [minor] is already settled in her new placement with an approved adoptive family, this worker is not recommending the [Grandmother] be assessed for placement. [Grandmother] has been informed that if circumstances shift and [minor] requires a placement change, she can request a placement assessment at that time."

The report noted Grandmother and minor's half-siblings (ages 8 and 11 years old) had developed a relationship with minor during monthly visits with her that had taken place since February 2013. The potential adoptive parents were committed to facilitating an ongoing relationship for minor and her half-siblings and Grandmother, but did not feel ongoing contact with Father was in minor's interests due to his limited role in her life and his incarceration.

After the section 366.26 hearing was continued, the Department filed an addendum to the assessment report on October 31, 2013. The social worker reported that the Department's placement specialist contacted Grandmother regularly during the five and a half months that minor lived in an emergency foster home. During that time, while Grandmother visited minor monthly, she did not request to be assessed to care for minor. The Department kept Grandmother informed that after all potential relative placement options were exhausted, the Department was searching for a nonrelative fost-adopt home for minor. Grandmother did not request that minor live with her during this search or after placement with the fost-adopt family on July 22, until August 30, 2013. The Department concluded a placement assessment for Grandmother could not be done because minor "was securely placed in a concurrent home that was committed to adoption and for whom an approved adoption home study had already been done." Grandmother could not be assessed in advance of a placement change because if a placement change was to be contemplated in the future a new assessment would have to

5

be performed at that time. The Department therefore concluded that no placement assessment should be performed based on Grandmother's August 30 communication. The Department advised that it continued to recommend termination of parental rights and adoption of a permanent plan of adoption.

On November 7, 2013, the court held the continued 366.26 hearing. Minor's counsel stated that she believed it was important to try to protect minor's rights to continued contact with her half-siblings and Grandmother. She had attempted to set up a "staffing" with the parties about this, but was unable to do so due to conflicting schedules. She informed the court the potential adoptive family was not willing to enter into a postadoption contract, but did appear to be committed to continuing the contact between minor and her half-siblings and Grandmother. Minor's counsel would have preferred a contract which would provide greater assurance minor would have continued contact with her siblings as well as a good and stable, permanent adoptive home. Minor's counsel noted Grandmother had made all the visits available to her, and attended all the court hearings. Minor's counsel expressed hope the adoptive parents were sincere in their commitment to continuing contact between minor and her half-siblings and Grandmother, and would gain more trust in that relationship before an adoption was finalized.

Father's attorney, Mr. Fuller, appeared at the hearing on his behalf as Father remained in custody in San Diego. Mr. Fuller did not contest the Department's recommendation that the court terminate Father's parental rights. Mr. Fuller stated: "Father made it clear that he wanted [minor] to be placed with [Grandmother], so I would note that there was a staffing that was talked about a few weeks ago, but I was never advised of it happening so I don't know if one happened without my input or not, but given all that, I'm prepared to submit on the report."

Grandmother apologized for not coming forward earlier, but stated she was now able to take minor and wished to have minor placed with her. She also stated she "clearly [could] see that it's not going to happen" but wanted at least to have something in writing

6

that she and minor's half-siblings be able to continue visitation.  The court advised that it lacked authority to require the adoptive family to enter into such a written contract.

The court found, by clear and convincing evidence, it was likely minor would be adopted and termination would not be detrimental to her.  The court terminated Father's and Mothers' parental rights.  The court also found the plan of adoption was appropriate and ordered adoption as minor's permanent plan.  The court found Grandmother was not an appropriate placement for minor.

Father timely appealed from the order terminating his parental rights.

## II.  DISCUSSION

Father contends the order terminating his parental rights must be reversed because the dependency court abused its discretion when it declined his request to have minor placed with Grandmother.  Father states:  "Since the Department did not conduct an assessment of [Grandmother] for preferential relative placement pursuant to section 361.3, subdivision (a),[3] there was insufficient evidence to support the juvenile court's order denying placement with [Grandmother].  This was an abuse of discretion . . . that prejudiced [Father]."  According to Father, had the dependency court assessed Grandmother as a potential placement it is likely minor would have been placed with her in a guardianship and Father's parental rights would not have been terminated.

### A.  *Father's Standing to Contest Placement*

As an initial matter, the parties dispute whether Father has standing to raise relative placement issues under section 361.3 as a basis to reverse the order terminating his parental rights.  We address this issue in light of *In re K.C.* (2011) 52 Cal.4th 231 (*K.C.*).  In *K.C.*, the dependency court denied the paternal grandparents' request the child be placed with them, terminated the father's parental rights, and ordered adoption as the

---

[3] Subdivision (a) of section 361.3 provides in relevant part:  "In any case in which a child is removed from the physical custody of his or her parents pursuant to Section 361, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative . . . ."  The statute defines "preferential consideration" to mean placement with such relative should be the first to be considered and investigated.  (§ 361.3, subd. (c)(1).)

child's permanent plan. (*Id*. at p. 235.) The father appealed the order denying placement with the grandparents. The Supreme Court affirmed the Court of Appeal's order dismissing the appeal, finding the father lacked standing because he was not personally aggrieved by the dependency court's order. The court explained that until parental rights are terminated, all parents have a compelling interest in the companionship, care, custody, and management of their children. Thus, when dependency proceedings begin, the law's first priority is "to preserve family relationships, if possible." (*Id*. at p. 236.) However, "after reunification services are terminated or bypassed . . . , 'the parents' interest in the care, custody and companionship of the child [is] no longer paramount. . . . [and] "the focus shifts to the needs of the child for permanency and stability . . . ." ' " (*Ibid*.) Because the father in *K.C.* did not argue that any exception to terminating parental rights existed, it logically followed "[t]hat he ha[d] no remaining, legally cognizable interest in [the child's] affairs, including his placement . . . ." (*Id*. at p. 237.)

The court in *K.C.* went on to distinguish two earlier appellate court cases—*In re H.G.* (2006) 146 Cal.App.4th 1 and *In re Esperanza C.* (2008) 165 Cal.App.4th 1042— that had "concluded . . . parents whose rights had been terminated . . . *did* have standing to appeal . . . pretermination orders concerning their children's placement, because the possibility existed that reversing those orders might lead the juvenile court not to terminate parental rights." (*K.C., supra*, 52 Cal.4th at p. 237.) The Supreme Court found these cases distinguishable because in both the parents contested termination of their parental rights following the challenged placement decisions. (See *In re H.G.*, at p. 8; *In re Esperanza C.*, at pp. 1051–1052, 1063.) Therefore, "the possibility existed [in those cases] that reversing those [placement] orders might lead the juvenile court not to terminate parental rights." (*K.C.*, at p. 237.)

From this, the *K.C.* court formulated the following rule: "A parent's appeal from a judgment terminating parental rights confers standing to appeal an order concerning the dependent child's placement only if the placement order's reversal advances the parent's argument against terminating parental rights." (*K.C., supra*, 52 Cal.4th at p. 238.) Because the father in *K.C.* "did not contest the termination of his parental rights in the

8

juvenile court. . . . he relinquished the only interest in K.C. that could render him aggrieved by the juvenile court's order declining to place the child with grandparents." (*Ibid.*, fn. omitted.) In response to the father's argument on appeal in *K.C.* that he had standing to seek reversal of the order terminating parental rights under *In re H.G.* and *In re Esperanza C.*—essentially the same argument Father advances here—the Supreme Court underlined that "[n]othing in those decisions suggests . . . that a reviewing court must reverse an order terminating the rights of a parent *who did not oppose that order when it was entered*." (*K.C.*, at p. 238, fn. 4, italics added.)

Here, because Father did not contest the termination of his parental rights in the dependency court, he relinquished the only interest in minor that could have rendered him aggrieved by the dependency court's order. He lacks standing to challenge minor's placement under the reasoning of *K.C.*

Further, setting aside Father's failure to contest the termination of his parental rights in the trial court, we reject his speculative claim that had the Department investigated Grandmother as a potential placement the dependency court might not have terminated his parental rights. He states that since Grandmother's ability to adopt minor had never been determined, if minor was placed with her as a relative caregiver, this would have supported application of the relative caregiver exception to termination of parental rights recognized in section 366.26, subdivision (c)(1)(A).[4] Apart from its highly speculative nature, Father's theory of how the case might have proceeded has no foundation in the record. Grandmother never requested minor be placed with her as a relative caregiver. During the time that a placement change to Grandmother might have been realistic, she was telling the Department she was *not* able to be a placement option

---

[4] Subdivision (c)(1)(A) of section 366.26 provides for an exception to termination of parental rights under the following circumstances: "The child is living with a relative who is unable or unwilling to adopt the child because of circumstances that do not include an unwillingness to accept legal or financial responsibility for the child, but who is willing and capable of providing the child with a stable and permanent environment through legal guardianship, and the removal of the child from the custody of his or her relative would be detrimental to the emotional well-being of the child."

for minor.  When Grandmother finally did step forward—after minor had been successfully transitioned to a fost-adopt family—she submitted a request to *adopt* minor.  Thus even if minor had been placed with Grandmother, the dependency court would have found her adoptable and Father's parental rights would have been terminated.  Father's groundless speculation Grandmother might have been approved for guardianship but not for adoption is too weak a reed to support standing.  Purely speculative injury does not confer standing.  (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1000; *Schwartz v. Provident Life & Accident Ins. Co.* (2013) 216 Cal.App.4th 607, 613.)

Father fails to establish that his support of Grandmother's eleventh-hour placement request affords him standing to appeal the termination of his parental rights.  However, as explained below, even assuming for purposes of analysis that Father has standing to raise the issue, we find no abuse of discretion in the denial of Grandmother's placement request.

**B.  *Denial of Grandmother's Placement Request***

The denial of a relative placement request is reviewed for abuse of discretion.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)  "[W]hen a court has made a custody determination in a dependency proceeding, ' "a reviewing court will not disturb that decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations]." ' [Citations] . . . 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.' " (*Id.* at pp. 318–319.)

As Father points out, the relative placement preference created by section 361.3 applies when a new placement becomes necessary after reunification services are terminated but before parental rights are terminated.  Section 361.3, subdivision (d) provides in relevant part:  "Subsequent to the [disposition] hearing . . . *whenever a new placement of the child must be made*, consideration for placement shall again be given as described in this section to relatives who have not been found to be unsuitable *and who will fulfill the child's reunification or permanent plan requirements*. . . ."  (Italics added.)  In *Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023 (*Cesar V.*), the Court of

Appeal rejected the view—based on a version of the statute superseded by legislative amendment in 1993—that relative placement was limited to providing a temporary caretaker to meet the child's physical and emotional needs while cooperating in reunification. (*Cesar V.*, at p. 1032.) The court held that as amended in 1993 and 1997, section 361.3, subdivision (d) contemplated that even after reunification failed, preference should still be given to placement with relatives who could provide legal permanence for the child *whenever a new placement must be made*. (*Cesar V.*, p. 1032.)

However, as *Cesar V.* also recognized, "It is well established that the relative placement preference found in section 361.3 does not apply after parental rights have been terminated and the child has been freed for adoption." (*Cesar V., supra*, 52 Cal.4th at p. 1031.) In particular, "[w]hen reunification has failed . . . and the juvenile court has before it a proposed permanent plan for adoption, the only relative with a preference is a 'relative caretaker' (if there is one seeking to adopt) and the only preference is that defined by subdivision (k) of section 366.26 . . . ." (*In re Sarah S.* (1996) 43 Cal.App.4th 274, 285–286; see also *In re Lauren R.* (2007) 148 Cal.App.4th 841, 855 ["There is no relative placement preference for adoption."].)[5] Thus, when the placement issue is raised for the first time at a section 366.26 hearing, at which time adoption has already been selected as the permanent placement goal, section 361.3 has no application. (*In re Lauren R.*, at p. 856.)

Father asserts "the first request to have the minor placed with [Grandmother] was made when the minor needed a new placement a few months before the permanency planning hearing." Father maintains that because no assessment of Grandmother was

---

[5] Section 366.26, subdivision (k) provides: "Notwithstanding any other provision of law, the application of *any person who, as a relative caretaker or foster parent, has cared for a dependent child* for whom the court has approved a permanent plan for adoption, or who has been freed for adoption, *shall be given preference* with respect to that child over all other applications for adoptive placement *if the agency making the placement determines that the child has substantial emotional ties to the relative caretaker or foster parent and removal from the relative caretaker or foster parent would be seriously detrimental to the child's emotional well-being.*" (Italics added.)

made at that time, the dependency court lacked any evidence upon which to base its denial of his request at the permanency planning hearing on November 7, 2013 that minor be placed with Grandmother. According to Father, this decision by the court at the permanency planning hearing, made without a sufficient evidentiary basis, was an abuse of discretion.

There are at least two flaws in Father's argument. First, minor did not need a new placement on August 30, 2013. The record shows minor was already settled and doing well in a new placement with an approved adoptive family on that date.[6] By its terms, section 361.3, subdivision (d) did not require consideration of Grandmother for placement unless minor needed a new placement on or after August 30. As of the permanency planning hearing that situation never arose.[7] The fact Grandmother changed her mind about caring for minor after she was placed with foster parents who wanted to adopt her did not trigger any requirement for consideration of a change in placement.

Second, assuming the passing comment made by Father's counsel at the permanency planning hearing can be construed as a request for placement with Grandmother, the dependency court did not need to have an assessment report on Grandmother before it could decide whether to grant or deny the request. At the permanency planning hearing, the court had before it a proposed permanent plan for adoption.[8] At that point, the only relative with a preference would have been a "relative

---

[6] Minor entered emergency foster care on February 7, 2013. She was placed in a concurrent home on July 22, 2013, following a structured transition from the prior emergency foster home.

[7] *In re Joseph T.* (2008) 163 Cal.App.4th 787, 795, cited by Father, is distinguishable. In that case, the Court of Appeal held only that the relative preference of section 361.3, subdivision (a) should be construed as an ongoing preference throughout the family unification phase whether or not a new placement is needed. Here, Grandmother did not come forward as a potential placement until after reunification services had been bypassed for the parents.

[8] Further, the court had the Department's explanation in its October 31 addendum report as to why no assessment was required in response to Grandmother's August 30 communication. No party at the hearing contested the Department's reasoning.

caretaker" seeking to adopt.  (*In re Sarah S., supra*, 43 Cal.App.4th at pp. 285–286; *In re Lauren R., supra*, 148 Cal.App.4th at p. 855.)  Because nothing in the record suggests Grandmother was ever minor's caretaker, Father cannot show any abuse of discretion.

By the time Grandmother stepped forward in this case, minor's need for stability and permanence was paramount.  She had already been placed with a loving, caring family intent on adopting to her, and with whom she was developing a strong bond.  No relative preference recognized in the law required this process to be disrupted or derailed at Father's behest.

### III.  DISPOSITION

The order terminating Father's parental rights is affirmed.


_____
Margulies, Acting P.J.


We concur:


_____
Dondero, J.


_____
Banke, J.